[Civ. No. 2496. Fourth Appellate District.—December 10, 1940.]

MILTON E. JOHNSON, Respondent, v. HAROLD A. FARMER et al., Appellants.

Schooling & Wayte and West & Crookshank for Appellants.

Blodget, Kuchel & Tobias and Harry R. Simon for Respondent.

BARNARD, P. J.—This is an action under the Unfair Practices Act (Deering's Gen. Laws, 1937, Act 8781; Stats. 1937, chap. 860).

Prior to August 1, 1938, the plaintiff was the only photo engraver having a place of business in Orange County. For several years, however, the defendants, who operated a photo engraving plant in Vernon with branches in Santa Barbara and Glendale, had, through salesmen, solicited and obtained business in the various cities and towns of Orange County. On August 1, 1938, the defendants opened a branch plant at Santa Ana equipped to do certain rush work and for the purpose of securing and handling other work which was sent to the Vernon plant. Six months later the plaintiff brought this action seeking to enjoin the defendants from selling photo engraving cuts below their cost of production, and asking for damages.

Among other things, the court found that the defendants, for the purpose of injuring the plaintiff, had manufactured and sold certain cuts for less than their cost of production and that on numerous occasions the defendants had sold cuts and plates at prices below their cost to the defendants, "which cost is and was in accordance with the Standard Scale for Photo-Engravers Form H, dated August 1, 1932". A judgment was entered awarding the plaintiff $335.90 as special damages and $1500 as general damages, and enjoining the defendants from selling, for the purpose of injuring the plaintiff, any cut for less than its cost of production, as defined in the Unfair Practices Act, and specifically enjoining the defendants from selling for the purpose of injuring the plaintiff any cut or product manufactured or produced in the photo engraving business "at a price or charge less than computed from and designated by the Standard Scale for Photo-Engravers Form H, dated August 1, 1932". This "Standard

Scale'' had been admitted into evidence as Plaintiff's Exhibit 1, and copies thereof were attached to and made a part of both the findings and judgment. From the judgment so entered the defendants have appealed.

The first question to be considered is whether the evidence supports the court's findings to the effect that such cuts had been sold by the appellants for less than the cost of production. The first requisite, of course, was that proof be made of the cost of production of these cuts and this the respondent failed to do. Section 5 of the Unfair Practices Act provides that where the particular trade or industry in question has an established cost survey for the locality in which the offense is claimed to have been committed, this cost survey shall be deemed competent evidence in proving the costs of the person or firm complained against. The Respondent's Exhibit 1, the ''Standard Scale'' above referred to, was admitted into evidence as such a cost survey, over the objection of the appellants. The importance and weight given to this scale is shown by the facts that the appellants were specifically found to have sold cuts for less than the cost of production, being the prices named in this schedule, and that they were enjoined from selling such cuts at prices or charges less than those designated therein.

It appears that this scale, Exhibit 1, was prepared by the American Photo-Engravers Association in 1932 from records obtained from that industry throughout the entire United States. The respondent argues that, since Santa Ana is in the United States, this scale is the cost survey for that locality within the meaning of section 5 of the Unfair Practices Act; that it was used by both respondent and appellants ''in pricing their products''; and that ''since the trial court did adopt the scale and make it a part of its judgment, it must have found that such survey represented the costs of these defendants''. Assuming that this was an average cost survey for all of the United States it may well be questioned whether it could be deemed competent evidence in proving costs of a particular firm in one particular community, under the provision of section 5 of the Unfair Practices Act. Be that as it may, the scale itself indicates that it was not prepared, intended or established as a cost survey.

This scale, Exhibit 1, consists of a large sheet with thousands of figures in dollars and cents conveniently arranged for finding the ones applicable to cuts or plates of varying sizes and

shapes. While it is stated thereon that it was "computed from cost records" it is not stated that the figures given are such cost records or average cost records. There are certain notes at the side of the figures which comprise the body of the scale. The first of these side notes gives directions how to use the scale in order to "Find the Scale Value of a Plate". Nearly all of these notes describe and define special processes and operations in connection with various kinds of photo engravings and indicate that extra charges should be made for such operations on a time basis. One of the early notes reads in part: "the following operations consist of hand work and differ in every instance, hence are not covered by scale figures and are sold at time rates for the time consumed". Subsequent notes state that the "figures on the scale are basic values", that "additional manipulations are charged extra as per the notes pertaining to such operations", and the notes then provide for innumerable extra charges with provisions that where two or more duplicates of the same thing are ordered they are to be "estimated" at a certain percentage off the scale. These side notes make no pretense of giving the cost of the various operations covered thereby and a headnote states that these side notes "indicate their average relation in cost to the figures in the body of the scale. These serve as a guide in estimating and pricing but do not fix the price of any photo-engraving. The actual sales price is made by the photo engraver in every case by the allowance of discount from both the figures shown in the body of the scale and from items referred to in these notes, or by the addition of an amount or percentage thereto". Another headnote reads:

"Photo-Engravings are always made to order. As no two are exactly alike, the cost of production, which involves chiefly skilled labor, fluctuates greatly in the same establishment and in every establishment. Since the cost of any photo-engraving cannot be determined beforehand and is known only after its completion, the necessity of a scale of some sort to aid in *estimating the approximate value of photo-engraving* before and after they are made is apparent. It enables the public to *estimate approximate prices* in advance and check invoices after production, subject to discounts or additions as aforesaid." (Italics ours.)

It clearly appears that this scale is not and was not intended to be a cost survey, average or otherwise. While average costs may have been used in its computation, it was

obviously designed for the purpose of furnishing a guide in fixing prices, with the suggestion that actual sales prices should be arrived at in individual cases by allowing discounts from the scale figures or by adding percentages thereto. That this scale was intended merely as a guide in fixing prices is further shown by the fact that it had been so used by both the respondent and the appellants. The respondent testified that he had been selling many cuts at prices far below the prices named in this standard scale, and that in fixing prices of cuts he used a system of balancing his costs as shown by his own cost records against the prices shown in the scale. He further testified that he sold cuts to commercial printers at prices 25 per cent less than those named in this standard scale; that he sold cuts to newspapers at 50 per cent off the scale price; that he would charge an ordinary customer the price named in the standard scale; and that these prices left him a profit.

It is obvious that this scale, Exhibit 1, should not have been admitted as a cost survey and that, in itself, it is not sufficient to prove the cost of production to the appellants of the cuts sold by them.

The respondent argues that it is immaterial in this case whether or not this scale, Exhibit 1, is actually a cost survey since other evidence which was introduced shows that this scale "represents the cost to these defendants". After a diligent search we are unable to find any such evidence in the record. Not only does it clearly appear that this scale has nothing to do with the appellants' cost of production, but we can find no evidence in the record showing what these costs were, and there is no finding as to what they were except the unsupported finding that the scale, Exhibit 1, designated such costs.

While it appears that the court completely relied upon that scale as showing appellants' cost of production and that the respondent mainly relies thereon, he argues that certain other portions of the evidence indicate that the appellants were selling cuts below the cost of production. For example, it is argued that one of the appellants admitted that they were selling below cost since he testified in general that to sell cuts at 75 per cent below the scale price would be to give them away, since at another time he testified that they were selling 1"x1-½" cuts for 75¢, and since 75 per cent off the scale price for these cuts would be 82¢. His testimony was that

to sell all cuts at 75 per cent off the scale would be to give them away. However, he testified that while they would lose money if they sold all sizes of cuts at a 75 per cent discount from the scale they could make more money on small cuts at 75 per cent off the scale than they could by selling large cuts at only 50 per cent from the scale. He testified that they made a profit at selling small cuts at 75¢ and that they did not plan to lose money on any cut. Again, it is argued that the appellants' auditor testified that the labor cost of making a 1″x1–½″ cut, making one cut by itself, was $2.64 and that such cuts were being sold for 75¢ However, the same witness testified that such cuts were produced on flats measuring 18″x22″, and that the labor cost of producing a full flat of cuts at the same time was only $1.53 more than the labor cost of a cut produced singly. Since there is room on an 18″x22″ flat to produce 264 of these small cuts at the same time it readily appears that the labor cost per cut, under such circumstances, is reduced to a few cents. We can find no evidence showing the actual cost of production to the appellants of any cut which was sold by them, under the circumstances under which it was produced.

The respondent argues that he made out a *prima facie* case against the appellants and that it was then incumbent upon them to prove their actual cost of production. The crux of the entire case is whether or not the appellants were selling below their cost of production and no *prima facie* case could be made out until evidence was produced supporting that proposition. Not only was the burden of proof upon the respondent, but he succeeded, through objections made, in preventing the appellants from showing their actual cost of production. In this connection, appellants' books and records covering their entire operations in both the Santa Ana plant and the main plant at Vernon, were excluded. Without that evidence it would be impossible to arrive at the exact cost of production of the cuts in question. While the respondent argues that each of the appellants' plants must stand upon its own feet and that we are not here concerned with anything in connection with the Vernon plant, it must be remembered that the Unfair Practices Act, in so far as material here, is concerned only with the cost of production to the appellants and not with the carrying on of a business in any particular locality. The evidence is that the

appellants had secured much business from the Santa Ana territory before they established a plant in that city, that one of the purposes in establishing the plant was that it serve as a feeder for the plant in Vernon, and that much of the work taken in by the Santa Ana plant was sent to Vernon and produced there. It seems clear that in arriving at the exact cost of production of a cut made in the Santa Ana plant it would be necessary to consider certain items of overhead, such as the cost of supervision, interest, taxes and the like, which would naturally be paid in connection with the Vernon plant. It would appear equally true that if the Santa Ana plant produced a large amount of business which was sent to the Vernon plant a part of the cost of the Santa Ana plant, as defined in section 3 of the Unfair Practices Act, would properly be chargeable to the general business in figuring the cost of production of such cuts as were produced in the Santa Ana plant. A determination of the actual cost of the cuts, alleged to have been sold by the appellants in violation of the act, would necessarily involve charging a fair proportion of some of the costs in the Santa Ana plant to the Vernon plant. The question involved was the cost to the appellants of producing the articles in question, and that issue could not be limited by purely local considerations or by factors outside the provision of the Unfair Practices Act. The respondent failed to prove appellants' cost of production for the items in question, and it cannot be held that the burden in this respect shifted to appellants, especially where, as here, they were prevented from showing their actual costs.

The appellants' next contention, that the judgment is void for uncertainty, must also be sustained. By its terms the judgment decrees that the appellants shall be enjoined from violating the Unfair Practices Act generally, with a further order that they shall not sell at prices less than the scale figures designated upon Exhibit 1. The first provision, enjoining them from violating the act, is entirely too broad. As was said in *Rust* v. *Griggs*, 172 Tenn. 656 [113 S. W. (2d) 733]: "He should not, however, be enjoined in general terms from violating the act in the future in every particular, for that would, as pointed out by the Supreme Court, compel defendant to conduct all his business under the jeopardy of punishment for violating a general injunction and violative of elementary principles of justice." With respect to the other portion of the judgment, ordering the appellants not to sell at

prices less than the scale figures, the evidence does not justify the adoption of that scale as the appellants' cost of production and, further, that scale provides for discounts from and addition to the figures therein designated, while the amount of such discounts or additions, respectively, are not indicated. No means are provided either in the scale or in the judgment for determining those factors. ■ The result is that the appellants are ordered to follow a scale which is so indefinite and uncertain that it cannot be told what is expected of them, and the judgment is void under the familiar principle that it must be sufficiently clear and definite to enable a party to comply with its requirements. (*Shriver et al. v. Superior Court et al.*, 48 Cal. App. 576 [192 Pac. 124]; *Young v. Enfield et al.*, 217 Cal. 662 [20 Pac. (2d) 701].) ■■ The last point raised is that the evidence does not sustain the judgment for damages. The court allowed the respondents $335.90 as special damages and general damages in the sum of $1500. With respect to the special damages the respondent states that the court took the total amount of sales made by the appellants in the Santa Ana plant, increased this by the "percentage which would represent the average or mean of the undercut prices as practiced by defendants against plaintiff", by taking this figure as the amount which the respondent would have received had he obtained all of such business, and by taking 16 per cent of this amount, this being respondent's net profit on his business as testified to by him. Even if a case for damages had otherwise been made out, this was not the correct measure thereof. Moreover, there is no evidence that all of the business done by the appellants in their Santa Ana plant was secured by selling cuts below the cost of production. There is neither evidence supporting the amount of special damages allowed, nor evidence supporting the judgment for general damages to the good will and reputation of the respondent.

■ We are here concerned not with the public policy expressed in the Unfair Practices Act, but with the manner in which the provisions of that act are to be applied and enforced. The first essential is that the actual cost of production shall be fairly, and at least approximately, determined upon satisfactory evidence. This would seem necessarily to call for the fair average cost of production over a reasonable time, rather than the cost of one item on a particular occasion. While

section 5 of the act makes proof of one or more acts of selling "below cost or at discriminatory prices" presumptive evidence of an intent to violate the act, another part of the same section provides that a local cost survey for a particular trade or industry shall be competent evidence of costs therein within the meaning of the act, and section 11 provides that "proof of average overall cost . . . for any particular inventory period, when added to the cost of production of each article" shall be presumptive evidence of the cost of the article. The act seems to contemplate and intend a fair average cost over a reasonable time as the standard below which sales must not be made. To construe the act otherwise would be to make it practically unworkable. Almost any business, no matter how ethically conducted, has particular days when the amount of overhead expense is out of all proportion to the business done. To apply the act strictly under such circumstances would defeat the purpose for which it was passed, and we think it was not intended to be so applied in determining the costs of production and distribution within the meaning of the act.

The judgment is reversed.

Marks, J., and Griffin, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on January 7, 1941, and the following opinion then rendered thereon:

THE COURT.—In requesting a rehearing herein the respondent argues that a portion of the judgment related to separate causes of action, involving price discrimination by the appellants, as between their own customers; that this matter was not considered in our opinion; and that this portion of the judgment should be affirmed.

The causes of action were not separately treated in the findings and judgment, the point now made was not raised in respondent's brief and is here presented for the first time, and a casual inspection indicates that the record does not support the portion of the judgment now sought to be sustained. Not only should parties to an appeal not be allowed to present their contentions piecemeal on successive hearings, but it here clearly appears that the matter now relied on is incidental to the main relief sought, and that it is one which,

in all fairness, should be considered with the other issues on a retrial of the entire action.

The petition for a rehearing is denied.

A petition by respondent to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on February 6, 1941.